UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: BIG BUCK BREWERY & STEAKHOUSE, INC.,
d/b/a BIG BUCK BREWERY AND STEAKHOUSE
and d/b/a AUBURN HILL WINERY,
_____/

BIG BUCK BREWERY AND
STEAKHOUSE, INC.,

   Plaintiff-Appellee     Bkrptcy No. 04-56761-SWR
                HON. STEVEN RHODES
vs.                Case No. 04-CV-74771
                HON. GEORGE CARAM STEEH
MICHAEL G. EYDE,

   Defendant-Appellant.

_____/

<u>OPINION AND ORDER AFFIRMING DECEMBER 6, 2004 SUPPLEMENTAL OPINION
FINDING DISGUISED FINANCING AGREEMENT UNDER 11 U.S.C. § 365</u>

   Appellant Michael Eyde appeals from a December 2, 2004 Opinion and December 6, 2004 Supplemental Opinion, entered by Bankruptcy Judge Steven Rhodes following an adversary proceeding, ruling that a 1997 Auburn Hills, Michigan property sale and ground leaseback transaction was a disguised financing agreement, and not a bona fide lease under Bankruptcy Code 11 U.S.C. § 365. A hearing on the appeal was held on April 25, 2005. For the reasons set forth below, the December 6, 2004 Supplemental Opinion will be AFFIRMED.

**I. Background**

   Debtor-in-possession Big Buck Brewery & Steakhouse, Inc. ("Big Buck") operates restaurants in Texas and Auburn Hills, Michigan. Big Buck filed for Chapter 11 bankruptcy protection on June 10, 2004, and filed an adversary proceeding on August 6, 2004 against

appellant Michael Eyde and National City Bank[1], challenging a 1997 sale and ground-leaseback transaction of the Auburn Hills real property as a fraudulent conveyance, and as a disguised financing agreement not qualified as a bona fide lease under Bankruptcy Code 11 U.S.C. § 365(d)(3), (4).  Big Buck's fraudulent conveyance claim was dismissed, and the remaining disguised financing agreement claim proceeded to a 1-day November 30, 2004 trial before Bankruptcy Judge Rhodes.

Record evidence shows Big Buck purchased the Auburn Hills real property from Takata, Inc. on August 29, 1996 for $2.5 million.  Big Buck initially solicited Eyde for a secured $4.4 million loan for the purpose of constructing a restaurant on the property and buying equipment.  Eyde was not interested.  Later, on August 1, 1997, Big Buck and Eyde executed a "Real Estate Purchase and Leaseback Agreement" ("P/L Agreement"), which provides in part:

> . . . Seller [Big Buck] hereby agrees to sell and lease back from Purchaser [Michael Eyde], and the Purchaser hereby agrees to purchase and lease back to Seller the [Auburn Hills, Michigan property] together with and all of the right, title and interest of the Seller in and to the land lying in the streets and roads abutting the Property, but excluding therefrom any and all buildings, improvements, appurtenances and personal property located thereon, all in accordance with the terms and provisions hereinafter set forth.
>
> 1. **PURCHASE PRICE**:  The purchase price shall payable [sic] by cashier's check or federal funds wire transfer at closing and shall be, at Purchaser's option, either Three Million and no/100 Dollars ($3,000,000.00), Three Million Five Hundred Thousand no/100 Dollars ($3,500,000.00), or Four Million and no/100 Dollars ($4,000,000.00).
>
> 2. **DEPOSIT**:  Immediately upon execution of this Agreement, Purchaser shall deposit with Seller the sum of One Million and 00/100 ($1,000,000.00) Dollars, as Purchaser's Good Faith Earnest Money Deposit, which sum shall be applied to the purchase price at closing. . . . .
>
> 3. **USE OF THE PROPERTY**:  Seller intends leaseback to the Property from

---

[1] National City Bank was subsequently dismissed from the adversary proceeding.

> Purchaser, and to construct and operate a microbrewery/restaurant as drawn on plans and specifications prepared by Seller's licensed architect . . . .
>
> *       *       *
>
> 8. **LEASEBACK**:  Seller agrees to leaseback the Property from Purchaser, based upon the Purchase Price Purchaser elects to pay for the Property, in accordance with the terms set forth in the Lease Agreement between Seller and Purchaser, a copy of which is attached hereto . . . .  At closing, Purchaser and Seller shall enter into the Lease Agreement in the form attached hereto . . . . which shall be determined based upon the amount of the Purchase Price selected to be paid for the Property by Purchaser.  If Purchaser elects a Purchase Price of Three Million and no/100 Dollars ($3,000,000.00), then the parties shall enter into the Lease Agreement exactly in the form attached hereto as Exhibit "D".  If Purchaser elects a Purchase Price of Three Million Five Hundred Thousand and no/100 Dollars ($3,500,000.00), then the parties shall enter into the Lease Agreement exactly in the form attached hereto as Exhibit "E".  If Purchaser elects a Purchase Price of Four Million and no/100 Dollars ($4,000,000.00), then the parties shall enter into the Lease Agreement exactly in the form attached hereto as Exhibit "F", and, in addition, Seller will convey to Purchaser, by Covenant Deed, certain real property adjacent to the Property . . . .
>
> *       *       *
>
> 20. **MISCELLANEOUS**:  TIME IS OF THE ESSENCE.  The laws of the State of Michigan shall govern and control the interpretation and enforcement of the terms and provisions of this Agreement.  This Agreement shall not be recorded.

P/L Agreement, at 1, 3-4, 7.  Big Buck and Eyde thereafter executed a "Lease Agreement"

on September 30, 1997, which reads in part:

> DATA SHEET
> 30th September
>
>      THIS LEASE AGREEMENT . . . by and between MICHAEL G. EYDE, ("Landlord"), and MICHIGAN BREWERY, INC., a Michigan corporation d/b/a Big Buck Brewery & Steakhouse ("Tenant"), subject [sic] to the following terms and conditions:
>
> *       *       *
>
> B.  TERM OF LEASE:  The Term of the Lease shall be twenty five (25) full Lease Years, as that term is defined in Article 2 herein, together with two (2) options to renew the Lease of ten (10) years each.

3

The Term shall commence on the Commencement Date, as defined in Article 2, and shall expire at midnight on the twenty-fifth day (25th) anniversary of the Commencement Date, unless this Lease is extended, renewed or sooner terminated as otherwise set forth herein.

C. BASE RENT: Tenant shall pay the following as its Base Rent annually:

Initial Term: From the Commencement Date through and including the fifth full Lease Year, Tenant shall pay $400,000.00 per annum, in twelve (12) equal monthly installments of $33,333.33.

Base Rent shall be adjusted on the sixth (6th) anniversary of the Commencement Date of this Lease, and on each five year anniversary thereafter as follows:

Annual Base Rent for the sixth through tenth years of the Lease shall be equal to the product of multiplying the sum of Four Million and no/100 ($4,000,000.00) dollars by the sum of one and three-quarters (1.75%) percent per annum plus the prime commercial lending rate for NBD Bank, established by NBD Bank from time to time in the ordinary course of its business ("Prime Rate") existing on the first day of the sixth Lease Year of the Lease, with a minimum Annual Base Rent of $400,000.00 and a maximum Annual Base Rent of $550,000.00.

Annual Base Rent for the eleventh through fifteenth years of the Lease shall be equal to the product of multiplying the sum of Four Million and no/100 ($4,000,000.00) dollars by the sum of one and three-quarters (1.75%) percent per annum plus the prime commercial lending rate for NBD Bank, established by NBD Bank from time to time in the ordinary course of its business ("Prime Rate") existing on the first day of the eleventh Lease Year of the Lease, with a minimum Annual Base Rent of $400,000.00 and a maximum Annual Base Rent of $550,000.00.

Annual Base Rent for the sixteenth through twentieth years of the Lease shall be equal to the product of multiplying the sum of Four Million and no/100 ($4,000,000.00) dollars by the sum of one and three-quarters (1.75%) percent per annum plus the prime commercial lending rate for NBD Bank, established by NBD Bank from time to time in the ordinary course of its business ("Prime Rate") existing on the first day of the sixteenth Lease Year of the Lease, with a minimum Annual Base Rent of $400,000.00 and a maximum Annual Base Rent of $550,000.00.

Annual Base Rent for the twenty first through twenty fifth years of the Lease shall be equal to the product of multiplying the sum of Four Million and no/100 ($4,000,000.00) dollars by the sum of one and three-quarters (1.75%) percent per annum plus the prime commercial lending rate for NBD Bank, established by NBD Bank from time to time in the ordinary course of its

business ("Prime Rate") existing on the first day of the twenty first Lease Year of the Lease, with a minimum Annual Base Rent of $400,000.00 and a maximum Annual Base Rent of $550,000.00.

\* \* \*

## LEASE

\* \* \*

Article 2: **TERM OF LEASE**

The Term of this Lease shall be for the number of Lease Years as set forth on the DATA SHEET after the Commencement Date as set forth below.

Section 2.1: Commencement Date: The Commencement Date and Tenant's obligation to pay Base Rent and other charges hereunder shall commence on October 1, 1997.

\* \* \*

Article 3: **RENT**

Section 3.1:  Base Rent:  Beginning with the Commencement Date and on the first (1st) of every month thereafter without demand, Tenant shall pay 1/12th of the then applicable Base Rent to Landlord at the address set forth on the DATA SHEET . . . .

Section 3.2 **Percentage Rent**:

   (a)  In addition to the payment of the fixed annual Base Rent, as herein provided, Tenant shall pay to Landlord during each lease year of the term hereof as annual percentage rental, a sum equal to the percent set forth in paragraph F of the Data Sheet hereof of all Gross Sales resulting from the sale of food and beverages in, on or from the leased premises during such lease year.  The annual percentage shall be payable annually, within sixty (60) days after the end of each Lease Year, at the office of the Landlord, or such other place as the landlord may designate.

\* \* \*

Section 3.3 **Gross Sales**:

\* \* \*

   (b)  **Repurchase Obligation:**  In the event that Gross Sales shall not exceed the sum of Eight Million and no/100 ($8,000,000.00) annually for any

two (2) consecutive full Lease Years during the term of the Lease, then Tenant shall be obligated to repurchase the Premises from the Landlord, upon Landlord's written request, within one hundred eighty (180) days after receipt of such request from Landlord. The purchase price for the Premises in such circumstances shall be equal to the sum of $4,000,000.00, plus $200,000 for each full lease year, plus a pro rata portion of a partial lease year, measured from the Commencement Date of this Lease to the date of receipt of such request from Landlord. The pro rata portion of the Purchase Price for such partial year shall be prorated on a per diem basis at the rate of $ 547.94 per day ($200,000/365). The closing shall otherwise be governed by Paragraphs 16.3 through 16.8 hereof, inclusive.

\*   \*   \*

Article 15:  **RIGHT OF FIRST REFUSAL**

Tenant is hereby granted a right of first refusal on the Property during the term of this Lease for any extensions or renewals thereof ("Right of First Refusal"). If at any time during the term of this Lease or any extensions or renewals thereof, Landlord receives a bona fide offer from a third party to purchase the Property, Landlord shall, within two (2) days from the date of execution thereof, supply Tenant with a complete copy of the executed purchase agreement and all exhibits and addenda thereto ("Sale Notice"). Landlord's Sale Notice shall constitute an offer to sell the Property to Tenant at the price and upon substantially the same terms and conditions as are contained in Landlord Sale Notice. Tenant shall have thirty (30) days after receipt of Landlord's Sale Notice and after all contingencies contained therein have been satisfied or waived (the "Offer Period'), in which to accept such offer and to agree to purchase the Property from Landlord at the price and upon substantially the same terms and conditions contained in the Sale Notice.

Article 16:  **OPTION TO PURCHASE/OPTION TO SELL/STOCK OPTION**

Article 16.1  **Option to Purchase**:  Landlord hereby grants to Tenant the option (the "Purchase Option") to purchase the Premises by written notice from Tenant to Landlord (the "Purchase Notice Option") given at any time after the end of the seventh full Lease Year of the term of the Lease and prior to the expiration of the original term of the Lease, or the end of the thirty fifth year of the Lease Year, if the First Option to Extend the Lease is exercised by the Tenant, or the end of the forty fifth Lease Year, if the second Option to Extend the Lease is exercised by Tenant. The purchase price for the Premises ("Purchase Price") shall be equal to the sum of $4,000,000.00, plus $200,000 for each full lease year, plus a pro rata portion of a partial lease year, measured from the Commencement Date of this Lease to the date of the exercise of the Purchase Option. The pro rata portion of the Purchase Price for such partial year shall be prorated on a per diem basis at the rate

6

of $547.94 per day ($200,000/365).

Article 16.2 **Option to Sell**.

(a) **Sale Option**: Landlord shall have the right to require Tenant to purchase the premises from Landlord ("Sale Option") by giving written notice from Landlord to Tenant (the "Sale Option Notice") given at any time prior to the end of the third full Lease Year of the term of the Lease. The purchase price for the Premises ("Purchase Price") shall be equal to the sum of $4,000,000.00, plus $200,000 for each full lease year, plus a pro rata portion of a partial lease year, measured from the Commencement Date of this Lease to the date of exercise of the Sale Option. The pro rata portion of the Purchase Price for such partial year shall be prorated on a per diem basis at the rate of $547.94 per day ($200,000/365). . . . .

Lease Agreement, at 1-2, 4-5, 8. A sale closing statement issued on February 6, 1998. An August 7, 1997 deed was claimed to have been lost and was never recorded, and a replacement Warranty Deed was recorded on February 25, 2000, conveying the "Big Buck Brewery Parcel" to Eyde.

To secure additional funds, Big Buck President William Rolinski, together with Eyde, executed a June 20, 2000 letter to the Wayne County Employees' Retirement System ("WCERS"), representing and warranting that: "Eyde is the sole fee simple owner of the Auburn Hills Site subject to the leasehold interest of Big Buck and no other party or entity has any right, title or interest in and to the fee interest of the Auburn Hills Site . . . ." Based on this letter, Eyde moved in limine, and for a directed verdict, arguing Big Buck was estopped from calling witnesses or otherwise claiming that Eyde was not the owner of the Auburn Hills property. Judge Rhodes denied both motions.

Several witnesses testified at the November 30, 2004 trial. Plante & Moran Certified Public Accountant ("CPA") Gregory Corson testified that the transaction was recorded on Big Buck's books as a financing transaction, also testifying the transaction constituted a "classic ground lease." Arthur Andersen CPA Robert Hollingsworth testified he issued a

7

memo describing the transaction as a "capital lease," with the land and buildings to be treated as Big Buck's assets, and Eyde's obligation as a long term liability. Hollingsworth likewise testified that the transaction was a "classic ground lease." Former Big Buck President William Rolinski testified that the intent of the parties' agreement was to complete a "ground lease." Big Buck's expert witness Gary Giumetti testified that repurchase prices set forth in the written documents could not be tied to the property's market value, and that Eyde incurred no financial risk associated with the value of the land, as the transaction provided for an assured yield on his investment. Appellant Eyde testified as to the intent to create a lease. Eyde's expert Richard Hanton appraised the market value of the land at $4.0 million at time of the transaction, consistent with the $4.0 million purchase price.

## II. Bankruptcy Court's December 2, 2004 Opinion

Following the November 30, 2004 adversary proceeding, Judge Rhodes issued a December 2, 2004 Opinion wherein he relied upon <u>United Airlines, Inc. v. HSC Bank USA (In re UAL Corp.)</u>, 307 B.R. 618 (Bankr. N.D. Ill. 2004) ("<u>UAL I</u>") for the appropriate factors to be considered in determining whether a transaction is a "true lease" or a disguised financing agreement under § 365. Judge Rhodes quoted <u>UAL I</u> as borrowing from the jurisprudence of the Uniform Commercial Code:

> And the need for a true lessor to retain risk at lease termination is reflected in the UCC's prescription that a true lease does not exist where "upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration." In such a situation, the lessee has effectively purchased the property through the mechanism of the lease, and so the lessee, not the lessor, has the benefit or burden of changes in the value of the property when the lease terminates. Similarly, if the lease lasts for the economic life of the property being leased, the lessee, not the lessor, bears the risk of changes in value. This is because the lessee will be paying a fixed amount to the lessor for whatever value the property has during its economic life, with the lessor having no risk other than nonpayment (the same risk as any secured lender bears).

December 2, 2004 Opinion, at 2 (quoting <u>UAL I</u>, 307 B.R. at 631).  Judge Rhodes then made specific findings with respect to the transaction between Big Buck and Eyde:

> 1. Eyde purchased the land only, and not the building on it.  (A replacement deed, Exhibit 47, which was created and recorded because the original was misplaced for a time, stated that the transfer included the buildings.  However, the original deed, Exhibit 17, since found, makes it clear that the deed from the debtor to Eyde was only for the land.  This intent is also consistent with the other contemporaneous documents and the testimony of the witnesses.)
>
> 2.  All parties, including Eyde, knew and intended that the $4 million "purchase price" was to be used to fund construction of the debtor's restaurant facility, and it was so used.  The parties' Real Estate Purchase and Leaseback Agreement, Exhibit 8, so provided in paragraph 2.
>
> 3.  The parties' "Lease Agreement," Exhibit 29, established a base rent based on a 10% return on Eyde's $4 million investment, without any substantial consideration for whether this was a fair market rent.  Indeed, in the first month, the "rent" was reduced specifically to account for the fact that Eyde had not yet fully "paid" the purchase price (i.e., funded the financing to the debtor.)
>
> 4.  The "Lease Agreement" also gives Eyde the right to require the debtor to re-purchase the property at a stated price ($4 million plus an escalator) if gross sales do not exceed $8 million annually in two consecutive years anytime during the 25 year term of the lease.  This has the effect of protecting Eyde's interest in the percentage rent, which was 5.25% of gross sales over $8 million.  It also has the effect of protecting Eyde from any decrease in market value that would naturally result from under-target sales.
>
> 5.  The "Lease Agreement" also gives Eyde the right to require the debtor to re-purchase the property at the same stated price for any reason anytime during the first three years of the lease.  This right is protected by an option in the stock of the debtor if the debtor does not pay the stated purchase price.
>
> 6.  The "Lease Agreement" also gives the debtor the option to purchase the property anytime after the seventh year at the stated price.
>
> 7.  The "Lease Agreement" also gives the debtor a right of first refusal should Eyde receive an offer on the property.

<u>Id</u>. at 3-4.  Judge Rhodes found these seven factors, "taken as a whole, strongly suggest the net effect of the transaction was to leave the debtor with all of the risks and rewards

associated with ownership of the property, and to leave practically none with Eyde." Id. at 2. Judge Rhodes applied the retained-risk standard articulated in UAL I, and concluded that Big Buck "established by a preponderance of the evidence that the parties' arrangement was a disguised financing agreement rather than a true lease." Id. As a result, Judge Rhodes ruled that Big Buck is the true owner of the property, and that Eyde is a creditor of Big Buck. Id. at 5.

Judge Rhodes rejected Eyde's argument that Big Buck was estopped from claiming ownership of the property by operation of the June 20, 2000 letter to the WCERS, finding that the representation of Eyde' ownership of the property was consistent with the intent of any leaseback transaction, that is, when "one party transfers legal title to another as security for financing, and then leases the property back from the seller, the parties specifically intend the transferee to become the title owner." December 2, 2004 Opinion, at 4. Judge Rhodes also cited UAL I as properly concluding that "the question is not how the parties documented their transaction; it is whether the lease is a true lease under section 365 of the bankruptcy code and who is the real owner of the property in light of the real economic consequences of the transaction." Id. at 4-5.

## II.  Bankruptcy Court's December 6, 2004 Supplemental Opinion

Judge Rhodes issued a second Supplemental Opinion on December 6, 2004, recognizing that UAL I was reversed in HSC Bank USA v. United Airlines, Inc. (In re UAL Corp.), 317 B.R. 335 (N.D. Ill. Nov. 16, 2004),[2] as first published on Westlaw on December 3, 2004.  December 6, 2004 Opinion, at 1.  The district court in UAL II held that the

---

[2]  In a different appeal in the same case, the district court reiterated its holding that the bankruptcy court erred in applying an "economic reality test" developed under federal law instead of applicable state law.  See HSC Bank USA v. United Airlines, Inc. (In re UAL Corp.), Nos. 04C3357-59, 2005 WL 563214, at *4 (N.D. Ill. Jan. 24, 2005) (citing UAL II).

bankruptcy court in UAL I improperly applied a federal rule of law known as the "economic realities test" instead of state law in determining that the transactions before it were not true leases under § 365 of the Bankruptcy Code. UAL II, 317 B.R. at **2, 3, 5 (citing inter alia Butner v. United States, 440 U.S. 48, 54 (1979)). Applying a rebuttable presumption arising under California law that an agreement is a lease if it contains a designation of the parties, a definite description of the property, periodic rental payments, and a right to occupy the property to the exclusion of the grantor, the UAL II court held that the transaction before it was a true lease in the absence of "*clear and convincing evidence*" that the parties intended to disguise a financing agreement as a lease. Id. at **5-6 (emphasis in original) (citing In re SCCC Assoc. II Ltd., 158 B.R. 1004, 1009-14 (Bankr. N.D. Cal. 1993)). The UAL II court set forth three factors under California law to be considered in discerning the parties' contractual intent:

> Whether a lease agreement is a true lease or one intended solely for security is determined by determining the intent of the parties at the time of the execution of the document. The intent of the parties is determined by reviewing all facts and circumstances of the transaction, including the economic substance of the transaction. Factors considered in this analysis include: (1) whether the transaction actually transfers the normal risks and responsibilities of landlord to the lessor; (2) whether the payments under the lease are reasonably designed to compensate the lessor for the use of the property or simply reflect the repayment of the lessor's acquisition cost plus interest; and (3) whether the lessor retains an economically significant interest in the property.

UAL II, 317 B.R. at **6 (internal citations omitted). In his Supplemental Opinion, Judge Rhodes quoted this three factor test as substantially similar to the factors applied in UAL I and his December 2, 2004 Opinion, and distinguished UAL II as relying on a lease presumption arising under California law, a presumption Judge Rhodes determined does not exist under Michigan law. December 6, 2004 Opinion, at 2. As a result, Judge Rhodes concluded that the decision in UAL II did not change his analysis or his conclusion in the

11

initial December 2, 2004 Opinion that the transaction between Big Buck and Eyde was a disguised financing transaction and not a true lease. December 6, 2004 Opinion, at 2-3.

## IV. Argument

Eyde argues Bankruptcy Judge Rhodes erred as a matter of law by applying a "preponderance of the evidence" standard in deciding whether the transaction at issue was a true lease or a disguised financing agreement. Eyde maintains that Michigan's "equitable mortgage" doctrine applies here, which provides that a deed creates a presumption of a transfer of ownership of real property which is rebuttable only by clear and convincing evidence, citing Ellis v. Wayne Real Estate Co., 357 Mich. 115, 97 N.W.2d 758 (1959), Schultz v. Schultz, 117 Mich. App. 454, 324 N.W.2d 48 (1982), and Koenig v. R. Van Reken, 89 Mich. App. 102, 279 N.W.2d 590 (1979). In a related argument, Eyde cites DeBruyn Produce Co. v. Romero, 202 Mich. App. 92, 98-99, 508 N.W.2d 150 (1993) for the proposition that a presumption of a valid lease arises under Michigan law, as in California, if the agreement at issue contains the parties' names, an adequate description of the premises, the length of the lease term, and the amount of rent. As additional support for applying a higher standard of proof, Eyde directs the court to In re Lansing Clarion Ltd. Partnership, 132 B.R. 845 (Bankr. W.D. Mich. 1991), a bankruptcy case challenging whether a transaction was a true lease under § 365, and in which the Bankruptcy Judge reasoned in part:

> [T]his court is cognizant that what is denominated or labeled as a lease is presumed to be a true lease absent compelling evidence to the contrary. See, e.g., In re PCH Associates, 804 F.2d 193, 200 (2nd. Cir. 1986).

In re Lansing Clarion, 132 B.R. at 850 (emphasis added). Eyde also reiterates his argument that Big Buck is estopped from denying Eyde owns the Auburn Hills property by operation of the June 20, 2000 letter to the WCERS.

12

## V. Standard of Review

A bankruptcy court's legal conclusions are reviewed de novo. Investors Credit Corp. v. Batie, 995 F.2d 85, 88 (6th Cir. 1993). A district court is bound by the bankruptcy court's findings of fact unless they are clearly erroneous, with due regard given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Bankr. Rule 8013. A bankruptcy judge's findings of fact are clearly erroneous when, although there is evidence to support them, the reviewing court is left with a definite and firm conviction that a mistake has been made. In re Rembert, 141 F.3d 277, 280 (6th Cir. 1998).

## VI. Analysis

The United States Supreme Court has made clear that, in bankruptcy proceedings, the question of whether a security interest exists in property is governed by state law, not federal law. See Butner, 440 U.S. at 54-56. The "clear and convincing" standard of proof advanced by Eyde has been recognized in Michigan "equitable mortgage" cases seeking to set aside a deed based upon contrary parol evidence. See Ellis, 357 Mich. at 118 ("[I]t is competent to show by parol that a deed absolute in form was in fact made as security for a loan."); Schultz, 117 Mich. App. at 458 (finding that witness testimony as to the parties' intent in executing a deed required proof beyond a "preponderance of the evidence," and further recognizing that "the party who asserts that an absolute conveyance is a mortgage bears a 'higher degree of proof than this' and must make it 'very clear' to the fact finder that the parties did not contemplate an absolute sale," quoting Grant v. R. Van Reken, 71 Mich. App. 121, 125-126, 246 N.W.2d 348 (1976)).

The Grant court, as quoted in Schultz, actually held that "one who asserts that an absolute conveyance is a mortgage bears a heavy burden of proof and he who invokes this equitable doctrine must furnish a preponderance of the evidence whereby it is made 'very

13

clear' to the fact finder that the parties did not contemplate an absolute sale." Grant, 71 Mich. App. at 126 (emphasis added).  The Michigan Court of Appeals in Koenig did not discuss the standard of proof applicable in equitable mortgage cases, but instead cited Grant as a similar case.  Koenig, 89 Mich. App. at 107, 107 n.1.  Koenig held that:

> Although no set of criterion has been established, the controlling factor in determining whether a deed absolute on its face should be deemed a mortgage is the intention of the parties.  Such intention may be gathered from the circumstances attending the transaction, including the conduct and relative economic positions of the parties and the value of the property in relation to the price fixed in the alleged sale.

Id. at 106 (emphasis added).

Indeed, Michigan law provides that the cardinal principle of contract interpretation requires a court to discern the parties' intent.  Sawyer v. Arum, 690 F.2d 590, 593 (6th Cir. 1982) (citing Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp., 608 F.2d 1106 (6th Cir. 1979)).  "[I]t has been said that all other rules of interpretation are subordinate to this rubric."  Id, at 593 (citing Goodwin, Inc. v. Orson E. Coe Pontiac, Inc., 392 Mich. 195, 220 N.W.2d 664 (1974)).  "Michigan's mandate to effectuate the contracting parties' intent has authoritatively been construed to require an examination into the circumstances surrounding a contract even where no ambiguity is apparent on the face of a document[.]"  Id. at 593 (citing Goodwin, Inc., 392 Mich. at 210).  See also Koenig, 89 Mich. App. at 106.  Parole evidence is admissible to prove that the parties to a written contract did not in fact intend to create legal relations, and that the writing was merely a "sham."  Id, at 593-594 (quoting NAG Enterprises, Inc. v. All State Industries, 407 Mich. 407, 285 N.W.2d 770 (1979)).  As here, where separate deeds and instruments are executed in temporal proximity, in relation to the same subject matter, between the same parties, and as part of the same transaction, the documents may be viewed together and construed as one

instrument. Nogaj v. Nogaj, 352 Mich. 223, 231, 89 N.W.2d 513 (1958) (affirming application of a "clear proof" standard). Ultimately, the plaintiff "bears the burden of establishing its interpretation of the contract by a clear preponderance of the evidence . . . ." Gary Boat Club, Inc. v. Oselka, 31 Mich. App. 465, 471, 188 N.W.2d 127 (1971) (emphasis added) (citing Barnes v. Beck, 348 Mich. 286, 83 N.W.2d 228 (1957)).

Upon de novo review of Michigan precedent, this court holds that Big Buck was required to prove by a clear preponderance of the evidence that Eyde and Big Buck intended to create a financing transaction rather than a true lease, with the parties' contractual intent to be discerned from the totality of the circumstances, including the parties' conduct and relative economic positions, the value of the property, the sale and leaseback prices, relevant parol evidence, and contractual interpretation of the unrecorded deed, the recorded Warranty Deed, the P/L Agreement, and the Lease Agreement, as a whole. Sawyer, 690 F.2d at 593-594; Nogaj, 352 Mich. at 231; Koenig, 89 Mich. App. at 106-107; Grant, 71 Mich. App. at 126; Gary Boat Club, 31 Mich. App. at 471.

Big Buck did not sue Eyde under a theory of equitable mortgage. Further, the only explicit reference to the "clear and convincing evidence" standard advocated by Eyde is in Ellis, as quoting McArthur v. Robinson, 104 Mich. 540, 549-550, 62 N.W. 713 (1895). Ellis, 357 Mich. at 118. The Michigan Supreme Court in McArthur, reasoned that:

> We think, on the whole record, that the complainant [alleging a deed was intended to be a mortgage] has sustained his case by a preponderance of the testimony. It is well settled that it is competent to show by parol that a deed absolute in form was in fact made as security for a loan. It is true that in this class of cases the proof ought to be clear and convincing, and sufficient to overcome the presumption that the instrument in question truly represents the transaction in its entirety . . . .

McArthur, 104 Mich. at 549-550 (emphasis added, internal citation omitted). Here, it was never undisputed that the unrecorded deed and recorded Warranty Deed did not represent

the entirety of the transaction. Big Buck's proofs were not limited to parol evidence. Big Buck was not required to prove by clear and convincing evidence that the P/L Agreement and Lease Agreement combined with these deeds to truly represent the subject sale and leaseback transaction in its entirety.

The Western District of Michigan Bankruptcy Court in In re Lansing Clarion relied upon the Second Circuit Pennsylvania case of In re PCH Associates in applying a "compelling evidence" standard, which in turn quoted the California case of Fox v. Peck Iron & Metal Co., 25 B.R. 674, 688 (Bankr. S.D.Cal. 1982) for the legal proposition of a "strong presumption that a deed and lease . . . are what they purport to be." In re PCH Associates, 804 F.2d at 200. Neither the parties nor this court have uncovered Michigan law, similar to California law, which creates a presumption, rebuttable only by "compelling" or "clear and convincing" evidence, that a *deed and lease* are "what they purport to be." The Michigan Court of Appeals in DeBruyn Produce simply lists the elements of a valid lease, and does not hold that a rebuttable presumption of lease validity arises if an agreement contains certain specific lease terms, let alone a presumption rebuttable only by "compelling" or "clear and convincing" evidence. See DeBruyn Produce, 202 Mich. App. at 98-99 (recognizing that "[i]n order for an agreement to be a valid lease, it must contain the names of the parties, an adequate description of the leased premises, the length of the lease term, and the amount of rent").

As a matter of Michigan law, Big Buck was required to show by a clear preponderance of the evidence that the subject sale and leaseback transaction was intended by Eyde and Big Buck to create a disguised financing transaction rather than a true lease. Also as a matter of Michigan law, Judge Rhodes was required to discern the parties' intent from the totality of the circumstances. Sawyer, 690 F.2d at 593-594; Nogaj,

352 Mich. at 231; Koenig, 89 Mich. App. at 106-107; Grant, 71 Mich. App. at 126; Gary Boat Club, 31 Mich. App. at 471. Judge Rhodes construed the P/L Agreement, Lease Agreement, and other documentary evidence in light of the proffered testimony, and concluded that Big Buck "established by a preponderance of the evidence that the parties' arrangement was a disguised financing statement rather than a true lease." December 2, 2004 Opinion, at 2. Absence of the modifying term "clear" preponderance of the evidence does not suggest that Judge Rhodes applied a burden of proof contrary to Michigan law. Indeed, Judge Rhodes concluded that the factors he considered, as outlined in his December 2, 2004 Opinion, at 2-4, "strongly suggest" that the parties' transaction was a disguised financing transaction. See December 2, 2004 Opinion, at 2-4. Judge Rhodes applied the proper evidentiary standard.

Judge Rhodes' clarified in his December 6, 2004 Supplemental Opinion that the retained-risk factors he relied upon in his initial December 2, 2004 Opinion, in applying UAL I's economic realities test, were substantially the same factors relied upon by the UAL II court in ascertaining the parties' contractual intent, leaving his analysis unchanged. December 6, 2004 Opinion, at 2. Both California law, as applied in UAL II, and Michigan law, as applicable here, require the parties' intent to be discerned from the totality of the circumstances. Compare UAL II, 317 B.R. at **6 ("The intent of the parties is determined by reviewing all facts and circumstances of the transaction, including the economic substance of the transaction"), with Edison Sault Electric Co. v. Manistique Pulp & Paper Co., 278 Mich. 592, 596, 249 N.W. 842 (1937) ("A contract should always be so construed as to carry into effect the intention of the parties, which must be ascertained from the language of the instrument, and the facts and circumstances attending its execution" (internal citation omitted)); Koenig, 89 Mich. App. at 106; Nogaj, 352 Mich. at 231. Read

together, the December 2, 2004 Opinion and December 6, 2004 Supplemental Opinion convey Judge Rhode's conclusion that Big Buck and Eyde *intended* to create the economic consequences resulting from their transaction, as set forth in Judge Rhode's seven factor analysis: (1) the parties intended that Eyde purchase only the land, as evidenced by the original unrecorded deed, with "[t]his intent . . . also consistent with the other contemporaneous documents and the testimony of the witnesses"; (2) the parties "knew and intended that the $4 million 'purchase price' was to be used to fund construction of [Big Buck's] restaurant facility, and it was so used"; (3) the Lease Agreement reflected an intent to establish a base rent based on a 10% return on Eyde's $4.0 investment without "substantial consideration for whether this was a fair market rent"; (4) the Lease Agreement reflected the intent to grant Eyde a right to require Big Buck to repurchase the land for $4.0 million plus an escalator if gross sales at the Auburn Hills restaurant did not exceed $8.0 million annually in two consecutive lease years during the initial 25 year term, with the intended consequences of protecting Eyde's rental interest in 5.25% of gross sales over $8.0 million, and protecting Eyde from any decrease in the market value of the land resulting from under-target sales; (5) the Lease Agreement reflected the intent to grant Eyde the right to require Big Buck to repurchase the property at the same stated price for any reason during the first three lease years, with Eyde's right to invoke repurchase protected by a stock option; (6) the Lease Agreement reflected the intent to grant Big Buck the right to purchase the land at the stated price anytime after the seventh lease year, and; (7) the Lease Agreement reflected the intent to grant Big Buck a right of first refusal if Eyde received an offer to purchase the land from a third-party. December 2, 2004 Opinion, at 2. From these seven factors taken as a whole, Judge Rhodes concluded that the transaction left Big Buck with all of the risks and rewards associated with the land's

ownership, and was therefore not a true lease, but a disguised financing transaction. Again, a fair reading of the December 2, 2004 Opinion and December 6, 2004 Supplemental Opinion reflects Judge Rhodes' conclusion that the parties *intended* to create a financing transaction disguised as a lease, and not a true lease. Eyde's argument that Judge Rhodes failed to consider the parties' contractual intent is not well taken.

Eyde does not advance a meaningful challenge to the seven specific facts relied upon by Judge Rhodes. To the extent Eyde argues that his expert Richard Hanton's $4.0 million appraisal of the land at the time of closing went uncontested, Judge Rhodes was entitled to assess Hanton's credibility, and the record as a whole, in deciding what weight to assign Hanton's testimony. Bankr. Rule 8013. This court is not left with a definite and firm conviction that a mistake of fact was made. In re Rembert, 141 F.3d at 280.

Judge Rhodes did not err in rejecting Eyde's equitable estoppel argument. Equitable estoppel arises in Michigan when a party induces another party to believe certain facts, justifiable reliance on a belief in those facts, and prejudice resulting to the second party if the first party is later permitted to deny those facts. Schepke v. Dept. of Natural Resources, 186 Mich. 532, 535, 464 N.W.2d 713 (1991). Judge Rhodes concluded that Eyde and Big Buck intended to create a *disguised* financing agreement. Given Eyde's own intent to disguise the financing transaction, Eyde cannot now reasonably be heard to say that he justifiedly relied upon the June 20, 2000 WCERS letter in believing that Big Buck intended to create a bona fide lease when executing the earlier August 1, 1997 P/L Agreement, the September 30, 1997 Lease Agreement, the August 7, 1997 unrecorded Deed, or the February 25, 2000 Warranty Deed.

## VII. Conclusion

The Bankruptcy Court's December 6, 2004 Supplemental Opinion is hereby AFFIRMED.

SO ORDERED.

          s/George Caram Steeh
          GEORGE CARAM STEEH
          UNITED STATES DISTRICT JUDGE

Dated: May 25, 2005

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on May 25, 2005, by electronic and/or ordinary mail.

          s/Josephine Chaffee
          Secretary/Deputy Clerk